**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Emerson Financial Group, Inc.,

Plaintiff,

v.

Transamerica Corporation,

Defendant.

**MEMORANDUM OPINION AND ORDER**
Civil No. 00-1606 ADM/SRN

---

Patrick J. Rooney, Esq., Rider, Bennett, Egan & Arundel, LLP, Minneapolis, MN, appeared for and on behalf of Plaintiff.

Donald J. Brown, Esq., Winthrop & Weinstine, St. Paul, MN, appeared for and on behalf of Defendant.

---

## I. INTRODUCTION

On November 15, 2001, the Cross Motions for Summary Judgment of Defendant [Doc. No. 28] and Plaintiff [Doc. No. 31], were argued before the undersigned United States District Judge. For the reasons set forth below, both Summary Judgment Motions are denied.

## II. BACKGROUND

The issue in dispute in this case is whether or not Emerson Financial Group, Inc. ("Emerson"), played a "role in developing" the business relationship between Transamerica Corporation ("Transamerica") and Legacy Marketing Group ("Legacy"). If so, Emerson is owed compensation pursuant to the July 30, 1996, "Special Agreement Between Emerson Financial Group and Transamerica Corporation for Legacy Marketing Group" (the "Special Agreement"). The relevant factual background is as follows.

JAN 1 5 2002
FILED
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD
DEPUTY CLERK

The three primary representatives of Emerson regarding the disputed contract are Owen Emerson ("Owen"), Chairman of Emerson, Walt Rugland ("Rugland"), a friend and business colleague of Owen's and formerly an insurance consultant for Indianapolis Life Insurance Company ("Indianapolis Life"), and Robert Herbster ("Herbster"), a business acquaintance of Owen working as a consultant for Legacy. For purposes of these Motions, Owen, Rugland and Herbster acted in a representative capacity for Emerson.

As they had done once before,[1] Owen and Herbster were engaged in attempting to locate an additional insurance carrier for Legacy around April, 1996. To this end, Owen contacted Rugland. Rugland was working with Transamerica Occidental Life Insurance Company ("Transamerica Life")[2] as a consultant, and identified Transamerica as a candidate. To initiate contact between Emerson and Transamerica, Rugland contacted a Transamerica executive, Ron Wagley ("Wagley"). Wagley referred Rugland to Tom Winters ("Winters"), a Transamerica Vice President. Rugland then put Winters in touch with Owen.

On May 16, 1996, Owen and Winters met in Minneapolis, Minnesota, to discuss the possibility of having Emerson assist Transamerica in finding a new insurance agency to sell Transamerica products. At this meeting, Emerson and Transamerica entered into a Confidentiality

---

[1] In or around February, 1996, Owen, Herbster and Rugland, on behalf of Emerson, and pursuant to a Special Agreement between Emerson and Indianapolis Life (identical to the Special Agreement in dispute here), worked together to identify and introduce Greg Carney, the President of Indianapolis Life, to Lynda Regan, the President of Legacy, leading to an agreement between Indianapolis Life and Legacy. Due to the resulting agreement between Indianapolis Life and Legacy, Emerson was compensated by Indianapolis Life according to the terms of the Special Agreement for its "role in developing" that relationship.

[2] Transamerica Life is an affiliate of Transamerica, and the names are used herein interchangeably.

Agreement, signed by Owen and Winters. Owen then disclosed the name of Legacy to Winters.[3] Emerson asserts that Owen also informed Winters of the Special Agreement Emerson had previously entered into with Indianapolis Life, explaining that Emerson was paid pursuant to that contract simply for introducing Legacy and Indianapolis Life.

After this meeting, on June 25, 1996, Herbster, acting on behalf of Emerson, contacted Lynda Regan ("Regan"), President of Legacy. Herbster informed Regan in a letter that he was aware of an insurance carrier potentially interested in working with Legacy. Emerson claims that Legacy expressed interest in establishing a relationship with a possible additional carrier.[4] Thereafter, on July 30, 1996, Emerson and Transamerica entered into the Special Agreement. The terms of this Special Agreement, in its entirety, were as follows:

> Transamerica Corporation and/or its affiliates, agree to provide compensation to Emerson Financial Group for its role in developing the relationship between Transamerica Corporation and Legacy Marketing Group.
>
> The Compensation will be paid as provided in Schedule A.

Pl. Ex. K. Following the execution of this Special Agreement, Owen referred Winters to Herbster to get more information, and Herbster sent a letter to Regan on August 20, 1996, disclosing the name of Transamerica to Legacy. Pl. Ex. L.

Next, Herbster asserts that he talked with Winters and learned that Transamerica had never heard of Legacy and was interested in information about them. Herbster also asserts that he met with Winters in September, 1996, in Kansas City, Missouri, where Herbster provided more specific

---

[3] Winters' expense statement, authorized by Wagley, listed that he was in Minneapolis, Minnesota, on May 16, 1996. The statement described that he was there to discuss a contract agreement, and noted the names of both Owen Emerson and Legacy Group. Sullivan Aff., Ex. B.

[4] This claim is disputed by Legacy. See Regan Dep. at 30, 32.

information and materials about Legacy. Herbster contacted Winters again on October 8, 1996, to reconfirm Transamerica's interest in Legacy. No further communication between Emerson and Transamerica occurred after October 8, 1996, and there is no evidence of any direct contact between Transamerica and Legacy until approximately one year later.

In September, 1997, Ronald Corlew ("Corlew"), who was then director of annuity sales for Transamerica,[5] went to New York for an equity index conference. While attending the conference on behalf of Transamerica, Corlew met Legacy executives Don Dady ("Dady") and Greg Egger ("Egger"). Corlew asserts that he had never heard of Emerson, Legacy, Regan, or Preston Pitts ("Pitts"), another Legacy executive, prior to meeting Dady in New York. Corlew Dep. at 28, 30, 34-35. Corlew and Dady exchanged contact information at the conference, and subsequently a fact-finding meeting was held between Corlew, Regan, Pitts and Egger to discuss the possibilities of a business relationship between Transamerica and Legacy. Id. at 36. Subsequent to these discussions, a marketing agreement was signed between Transamerica and Legacy on May 29, 1998. Both Transamerica and Legacy allege Emerson played no role in developing the business relationship, and that the discussions involving Emerson regarding Transamerica and Legacy in 1996 had been dormant for some time prior to Corlew's meeting with Dady and Egger in New York. See Corlew Dep. at 52; Regan Dep. at 63-64.

## III. DISCUSSION

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be rendered only if there exists no genuine issue as to any material fact and the moving party is entitled

[5] Corlew reported directly to Wagley, and attended staff meetings with both Wagley and Winters to discuss updates on group projects. Corlew Dep. at 12, 19-20.

to judgment as a matter of law.

The United States Supreme Court, in construing Rule 56(c), stated in Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986):

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party. Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995). However, the nonmoving party may not "rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

If evidence sufficient to permit a reasonable jury to return a verdict in favor of the nonmoving party has been presented, summary judgment is inappropriate. Id. However, "the mere existence of some alleged factual dispute between the parties is not sufficient by itself to deny summary judgment . . . . Instead, 'the dispute must be outcome determinative under prevailing law.'" Get Away Club, Inc. v. Coleman, 969 F.2d 664, 666 (8th Cir. 1992) (citation omitted).

In this case, disputed and conflicting facts muddy the summary judgment water. Viewing the facts in favor of Emerson in considering Transamerica's Motion, Emerson argues that Winters was specifically told that Legacy was looking for an additional carrier, and that Winters knew about the Indianapolis Life Special Agreement. Wagley's expense statement supports Emerson's claim that, at one time, Emerson did discuss Legacy with Transamerica. The letters sent by Emerson to Legacy also confirm that Emerson provided Transamerica's name to Legacy. Emerson also seeks

an inference that because Corlew worked at Transamerica during the time when Emerson was providing Winters and Wagley with information about Legacy, and Corlew attended meetings with Winters and Wagley, he might have heard about Legacy back in 1996.

Conversely, viewing the facts in favor of Transamerica in considering Emerson's Motion, Transamerica argues that the almost year-long lapse in time after any Emerson contact with Legacy or Transamerica makes it unreasonable to claim that Emerson "played a role in developing" the later relationship that grew from Corlew meeting Dady and Egger in New York. There is no evidence of any activity by Emerson after October 8, 1996, to "play a role in" developing a relationship between Legacy and Transamerica. However, Emerson did play a role in disclosing the names of the two respective companies to each other in 1996. It is uncertain whether or not this "role" satisfies the terms of the contract, given the time lapse and different employees involved in the 1997 New York meeting. Material facts point both directions.

What type of activity the parties intended for Emerson to conduct in order to satisfy the contract term, "developing the relationship," is also uncertain and in dispute. The parties dispute whether or not the contract is akin to a finder's fee contract or a broker's contract, whether or not such a contract requires the finder or broker to be a procuring cause of the resulting transaction (which the broker or finder claims entitles it to a commission), and, even if such a requirement exists, whether or not the Special Agreement nevertheless was meant to state otherwise. See Def. Reply Mem. at 1; Pl. Reply Mem. at 6. The parties also dispute whether or not a single introduction of two parties was meant to satisfy the contract. These questions turn on the parties' intended meaning of the phrase "role in developing." Discerning that intention is a fact question. Whether or not Emerson was actually a procuring cause, if required to be, is also a fact intensive question.

The facts as argued in this Motion create genuine issues regarding whether or not the information provided to Transamerica by Emerson in fact played a role in Transamerica's entering into an agreement with Legacy. Summary Judgment must be denied.

## IV. CONCLUSION

Based on the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendant's Motion for Summary Judgment [Doc. No. 28] is **DENIED**, and
2. Plaintiff's Cross Motion for Summary Judgment [Doc. No. 31] is **DENIED**.

BY THE COURT:

ANN D. MONTGOMERY
UNITED STATES DISTRICT JUDGE

Date: January 15, 2002